IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | Criminal No. 2:17-CR-129-D |
| | § | |
| DANYELL MICHELLE ROBERTS (1) | § | |
| | § | |
| Defendant. | § | |

MEMORANDUM OPINION
AND ORDER

Defendant Danyell Michelle Roberts ("Roberts") moves to suppress and preclude the government from introducing as evidence at trial contraband (including 18 bundles of substance alleged to be cocaine and fentanyl) seized following a traffic stop. After an evidentiary hearing, and for the reasons that follow,[1] the court denies the motion.

I

On December 19, 2017 Texas Department of Public Safety ("DPS") trooper Kendall Styles ("Trooper Styles") was patrolling Interstate Highway 40 ("I-40") in Carson County, Texas. He has been employed as a DPS officer for more than four years, all in Carson County. At the time of the traffic stop in question, Trooper Styles was enforcing traffic laws and performing drug interdiction. Based on his training and experience, he believes that I-40 is a drug trafficking corridor. According to Trooper Styles, this is because I-40 is

_____

[1]Pursuant to Fed. R. Crim. P. 12(d), the court sets forth in this memorandum opinion and order its essential findings.

unsupervised, there are no checkpoints, and the highway spans from the East to the West Coast, which is the main corridor for drug smuggling. In Carson County, he and other troopers have made hundreds of stops involving interdiction or drug seizures. Trooper Styles estimates that he has made more than 40 traffic stops that have resulted in the seizure of a large amount of narcotics.

On December 19, 2017, while traveling westbound on I-40 and observing traffic, Trooper Styles noticed a black Jeep SUV ("Jeep") traveling eastbound behind a semi. As he passed the Jeep, he noticed that it was going faster than the semi it was following. This caught his attention because the Jeep was gaining distance on the semi, which concerned him that the Jeep was potentially following the semi too closely.

After momentarily losing visual contact with the Jeep, Trooper Styles made a U-turn and began to pursue the vehicle. Based on the known length of the stripes painted on the highway and of the intervals between stripes, it appeared that the semi and Jeep were so close that they were actually towing each other. Trooper Styles approximates that the Jeep was 100 feet behind the semi. Using his Doppler radar, he determined that the Jeep was traveling 72 m.p.h. Trooper Styles concluded that, at that speed, the Jeep should have been following 316 feet behind the semi, assuming the driver of the Jeep was an experienced driver. The required distance would be even greater for an inexperienced driver. In Trooper Styles's estimation, traveling at 100 feet behind the semi, the Jeep could not have stopped and avoided a collision had there been some sort of catastrophic event, a blowout, or a sudden stop.

The semi that was immediately in front of the Jeep (referred to at the hearing as semi No. 1) then passed a semi in front of it (referred to as semi No. 2). The Jeep was at that point approximately 240 feet behind semi No. 2. Because the Jeep needed 316 feet to stop, it was too close to semi No. 2 as well. The Jeep committed a violation of Tex. Transp. Code Ann. § 545.062(a) by following the two semis too closely, and Trooper Styles intended at this point to cite the Jeep driver for the violation.

Trooper Styles then pulled up next to the Jeep. He does this on every traffic stop for purposes of looking at the number of occupants in the vehicle (including innocent parties who may be affected in the case of a high-speed pursuit), and ensuring there are no other traffic violations, such as registration violations, seat-belt violations, obscured windshields, and the like. He observed no other violations at that time. Trooper Styles then effected a traffic stop of the Jeep.

Roberts was the Jeep driver. One passenger, who first gave the name "Janae Simpson," was Zakiyyah Antonia Luke ("Luke"). The other passenger was an 18-month-old baby.

After effecting the stop, Trooper Styles exited his DPS unit and immediately advised Roberts that she had been following the semi too closely. He observed in the Jeep what he considered to be signs of "hard traveling"—fast food, drinks, and other items that indicated the occupants had not been stopping during the trip. "Hard traveling," which shows that occupants are trying to get from one place to another in a time crunch, is common in drug smuggling. Trooper Styles also noted that the vehicle displayed a Tennessee license plate,

but that Roberts' driver license was issued out of Orlando, Florida. This drew his interest because these were two different states, and Roberts had stated that the Jeep was a third-party vehicle. Third-party vehicles alert troopers, especially when they are from a different state, because it is common in drug smuggling for someone not to use her own vehicle, which can be lost in the process.

After directing Roberts to exit the Jeep, Trooper Styles began asking Luke questions. Luke said they were coming from "Arizona," but she did not know what city in Arizona they had been to, which concerned Trooper Styles. Luke then made the statement, "I just rode with her," which gave him the impression that Luke was trying to distance herself from the vehicle and the situation. Luke also told Trooper Styles that she had been to her grandmother's funeral, which seemed suspicious considering that Luke had said that she "just rode with her." And when questioned, Luke could not remember the date of the funeral, which also concerned Trooper Styles since Luke supposedly had just attended the funeral, nor could Luke remember the name of the funeral venue. Luke stated that Roberts and she had stayed at her aunt's house while on the trip. Luke initially gave a false name (Simpson) and denied any arrest history. She then said that she had had a minor arrest for a driver license offense. Based on Luke's statements alone, Trooper Styles had a suspicion that there was some criminal activity afoot. He knew at this point that this was more than just a basic traffic stop based on Luke's itinerary, and the fact that she did not know much about a cross-country trip in which she had just attended her grandmother's funeral, but did not know the main details.

Trooper Styles then returned to his DPS unit and directed Roberts to sit in the front passenger seat. He observed that she appeared very nervous and had a sense of high stress. She had a bluetooth device around her neck that was moving rapidly in tandem with the pulse of her carotid artery.

Roberts told him that she and her passengers had come from Phoenix, Arizona. She also stated that they had attended a funeral in Las Vegas, which raised Trooper Styles's suspicion because, although Luke had attended the same funeral, she did not mention being in Las Vegas,. Roberts said that the funeral was for a close family friend named "Keisha," hesitating before providing Keisha's name. Roberts stated that neither she nor Luke was related to the person who died. She also hesitated somewhat when stating the date of the funeral, saying that it was "Friday." Roberts said that, during the trip, they had stayed at the Days Inn, where Roberts has a membership. Luke had said, however, that they had stayed at an aunt's house, which contradicted Robert's statement. When asked about her criminal history, Roberts responded that she had only been arrested for a suspended driver license, when in fact she had a more serious criminal history. It was suspicious to Trooper Styles that Roberts and Luke had not been honest about their criminal histories. Based on his training and experience working on I-40, it is common for drug smugglers to try to hide their criminal histories in order to sound like they are not bad people. Roberts also told Trooper Styles that Luke was pregnant with a high-risk pregnancy and unable to drive. He found it suspicious that someone with a high-risk pregnancy would travel so far.

At this point, Trooper Styles had a suspicion that Roberts and Luke were involved in

criminal activity. This suspicion was based on differences in their stories about their trip itinerary, where they had stayed, the quick duration of a trip from Orlando, Florida to Las Vegas, Nevada, the third-party vehicle, and the hard traveling (lived-in) look of the vehicle.

Based on this suspicion, Trooper Styles decided to ask Roberts for consent to search the Jeep. He first returned all of her documents to her and provided a printed copy of a warning for violating Tex. Transp. Code Ann. § 545.062(a). Trooper Styles then asked, "can I search the vehicle and make sure there is nothing ?" and Roberts replied, "sure." Roberts did not appear to hesitate when giving her consent, and she never revoked her consent. She was not restrained at any time; she was cooperative; and she appeared to be at least of average intelligence.

Trooper Styles, DPS Corporal Darrin Bridges ("Corporal Bridges"), and DPS Trooper Robert Bowden then searched the Jeep. Corporal Bridges has almost 23 years of law enforcement experience, and he has training and experience as an instructor in drug interdiction. He has spent almost 20 years doing highway interdiction for Texas DPS on I-40, and has made hundreds of traffic stops involving the seizure of narcotics. These stops include hundreds that have involved aftermarket hidden or secret compartments. Corporal Bridges has observed several of such compartments in Jeep SUVs. In his opinion, I-40 is a common drug trafficking corridor.

Trooper Styles and Corporal Bridges began their search with the trunk and cabin and then turned to a section underneath the rear cargo area. It is common to have false compartments in the cargo area. Viewing the underside of the vehicle, Trooper Styles

noticed a lot of tampering that is not common under vehicles, including with the heat shield. Corporal Bridges also noted that the heat shield had been distorted from its original form due to an adjustment made in the floor of the Jeep. Trooper Styles and Corporal Bridges observed a rust spot in the rear cargo area. Aided by a flashlight, Trooper Styles and Corporal Bridges were able to look through the rust spot and see black electrical tape. This indicated to them that there was definitely some aftermarket tampering with the vehicle, and they suspected that the black electrical tape was indicative of a bundle, which is common packaging for narcotics. Trooper Styles also observed an undersized spare tire, which is used to attempt to hide the addition of the aftermarket compartment. The 2005 Jeep typically has a full-size spare, so the small spare tire was significant to Corporal Bridges as well. Trooper Styles and Corporal Bridges also noted the presence of Bondo, which is a kind of filler that indicates aftermarket tampering, and of cracks in the Bondo. These were observable when the two troopers were underneath the vehicle. Based on what they observed, Trooper Styles and Corporal Bridges believed the Jeep had a secret compartment.

Trooper Styles and Corporal Bridges then attempted to locate an access door to the floor compartment. It is common that such compartments involve cutting into the frame rail on the underside. Trooper Styles used an upholstery tool to scrape over-spray left on the underside of the vehicle where someone had attempted to make the aftermarket compartment blend in with the rest of the vehicle. Trooper Styles and Corporal Bridges were unable to access the compartment from underneath the vehicle, and suspected that the access was from the top of the compartment. They decided to take the Jeep to the Panhandle Department of

Public Safety Office ("Panhandle DPS office"), which was a safer location than was the side of I-40 to access the compartment from the top. Another DPS Trooper drove with Luke in the Jeep, and Trooper Styles drove Roberts in his DPS unit to the Panhandle DPS office. There, officers accessed the rear cargo floor of the vehicle and discovered 18 bundles of suspected cocaine and fentanyl, weighing approximately 58 pounds, inside the secret compartment.

Roberts moves to suppress and preclude the government from introducing as evidence at trial the contraband (including 18 bundles of suspected cocaine and fentanyl) seized during the search of the vehicle. The government opposes the motion. The court has conducted an evidentiary hearing.

## II

The Fourth Amendment protects individuals against unreasonable searches and seizures. "The stopping of a vehicle and detention of its occupants constitutes a 'seizure' under the Fourth Amendment." *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004). Evidence derived from an unreasonable search or seizure generally must be suppressed under the "fruit-of-the-poisonous-tree doctrine." *United States v. Alvarado-Zarza*, 782 F.3d 246, 249 (5th Cir. 2015) (citing *United States v. Cotton*, 722 F.3d 271, 278 (5th Cir. 2013)). "Warrantless seizures are 'per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *Id*. (quoting *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014)). One such exception comes from *Terry v. Ohio*, 392 U.S. 1 (1968).

The framework articulated in *Terry* is used to analyze the legality of a traffic stop. "Under the two-part *Terry* reasonable suspicion inquiry, [the court asks] whether the officer's action was: (1) 'justified at its inception'; and (2) 'reasonably related in scope to the circumstances which justified the interference in the first place.'" *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (quoting *Terry*, 392 U.S. at 19-20). "A temporary, warrantless detention of an individual constitutes a seizure for Fourth Amendment purposes and must be justified by reasonable suspicion that criminal activity has taken or is currently taking place; otherwise, evidence obtained through such a detention may be excluded." *United States v. Garza*, 727 F.3d 436, 440 (5th Cir. 2013). "Reasonable suspicion requires more than merely an unparticularized hunch, but considerably less than proof of wrongdoing by a preponderance of the evidence." *Id.* (internal quotation marks and citation omitted). As this court has previously explained:

> For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle. The Supreme Court has stated that in making a reasonable suspicion inquiry, a court must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing. We have stated previously that reasonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure. In evaluating the totality of the circumstances, a court may not consider the relevant factors in isolation from each other. In scrutinizing the officer's basis for suspecting wrongdoing, it is clear that the officer's mere hunch will not suffice. It is also clear, however, that reasonable suspicion need not rise to the level of probable cause.

*United States v. Johnson*, 2006 WL 1041148, at *3 (N.D. Tex. Apr. 20, 2006) (Fitzwater, J.) (quoting *Lopez-Moreno*, 420 F.3d at 430).

Although "[a] defendant normally bears the burden of proving by a preponderance of the evidence that the challenged search or seizure was unconstitutional[,] . . . where a police officer acts without a warrant, the government bears the burden of proving that the search was valid." *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (citations omitted). Accordingly, "[t]he government bears the burden of establishing by a preponderance of the evidence [the] two elements under *Terry*[.]" *Johnson*, 2006 WL 1041148, at *3 (citing *United States v. Sanchez-Pena*, 336 F.3d 431, 437 (5th Cir. 2003); *United States v. Riley*, 968 F.2d 422, 424-25 (5th Cir. 1992)).

III

Roberts maintains that she did not commit any traffic violation that justified the initial stop. The government contends that Trooper Styles stopped Roberts for following the semi too closely, in violation of Tex. Transp. Code Ann. § 545.062(a). Section 545.062(a) provides:

> [a]n operator shall, if following another vehicle, maintain an assured clear distance between the two vehicles so that, considering the speed of the vehicles, traffic, and the conditions of the highway, the operator can safely stop without colliding with the preceding vehicle or veering into another vehicle, object, or person on or near the highway.

Tex. Transp. Code Ann. § 545.062 (West 2018).

The court finds that, when Trooper Styles stopped Roberts' vehicle, he had an

objectively reasonable suspicion, based on the distance between Roberts' vehicle and the semi, that Roberts' vehicle could not "safely stop without colliding with the [semi.]"

Trooper Styles credibly testified that, at the time he effected the traffic stop, he estimated that Roberts was following approximately 100 feet behind the semi identified at the hearing as semi No. 1. He also testified, based on the three second rule described in the Texas Driver Handbook, that traveling at approximately 72 miles per hour, Roberts should have allowed approximately 316 feet between her vehicle and the semi. He concluded that Roberts would have collided with the semi had it stopped suddenly. The Fifth Circuit has upheld traffic stops by law enforcement based on similar circumstances. *See United States v. Gonzalez*, 658 Fed. Appx. 748, 749 (5th Cir. 2016) (per curiam) (holding that vehicle traveling at 73 miles per hour 60 to 80 feet behind semi gave officer reasonable suspicion for stop); *United States v. Wallstrum*, 515 Fed. Appx. 343, 349 (5th Cir. 2013) (per curiam) (affirming district court holding that vehicle traveling 70 miles per hour at about 60 to 90 feet behind other vehicle gave officer reasonable suspicion to effect traffic stop).

Roberts maintains that Trooper Styles could not have ascertained that Roberts' vehicle was traveling too closely to the semi because he could not have observed the interval between the vehicles from his vantage point. The court is not persuaded by this contention in light of Trooper Styles's credible testimony that his perspective from his vehicle was closer than what was depicted in the video played during the suppression hearing.[2]

---

[2]Trooper Styles testified: "the perspective I have in my vehicle is a lot closer than what this video is depicting"; and "Like I said, my eyes—this picture doesn't depict it as

The court also declines to accord weight to Roberts' contention in closing argument that Trooper Styles's failure to stop semis that were violating the same law at the same time, focusing instead on Roberts' vehicle, provides a basis for granting her motion to suppress. "[T]he constitutional reasonableness of the stop does not depend upon the actual motivations of the officer involved. An officer may stop a motorist for a traffic violation even if, subjectively, the officer's true motive is to investigate unrelated criminal offenses." *Sanchez-Pena*, 336 F.3d at 437. In this case, the government has "point[ed] to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *Id.* That Trooper Styles could have stopped other vehicles rather than Roberts' Jeep is of no moment.

Accordingly, the court concludes that, at the time he stopped Roberts' vehicle, Trooper Styles had an objectively reasonable suspicion that she was following semi No. 1 too closely, in violation of Tex. Transp. Code Ann. § 545.062(a).

IV

Roberts contends that Trooper Styles extended the traffic stop beyond the time required to issue the warning for the initial traffic violation.

A

Under the second prong of *Terry*, the court asks whether Trooper Styles's actions after stopping Roberts' vehicle "were reasonably related to the circumstances that justified the

what my eye can see. This is a lot farther than what it is in real life."

stop, or to dispelling his reasonable suspicion developed during the stop." *Brigham*, 382 F.3d at 507. "An officer's subsequent actions are not reasonably related in scope to the circumstances that caused him to stop the vehicle if he detains its occupants beyond the time needed to investigate the circumstances that caused the stop, unless he develops reasonable suspicion of additional criminal activity in the meantime." *United States v. Pack*, 612 F.3d 341, 350 (5th Cir. 2010), *modified on other grounds*, 622 F.3d 383 (5th Cir. 2010); *see also United States v. Spears*, 636 Fed. Appx. 893, 901 (5th Cir. 2016) ("The time reasonably required to complete the mission of issuing a traffic ticket can include the time it takes to inspect the driver's license, automobile registration, and proof of automobile insurance; run computer checks; determine whether there are outstanding warrants against the driver; and ask the purpose and itinerary of the trip.") (citing *Rodriguez v. United States*, ___ U.S. ___, 135 S.Ct. 1609, 1615 (2015); *Pack*, 612 F.3d at 350). If, however, "the officer develops reasonable suspicion of additional criminal activity . . . , he may further detain [the] occupants [of the vehicle] for a reasonable time while appropriately attempting to dispel this reasonable suspicion." *United States v. Andres*, 703 F.3d 828, 833 (5th Cir. 2013) (alterations in original) (quoting *Pack*, 612 F.3d at 350). As explained above, "[r]easonable suspicion exists when the detaining officer can point to specific and articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the search and seizure." *United States v. Estrada*, 459 F.3d 627, 631 (5th Cir. 2006). "The determination . . . must be made based on the totality of the circumstances and the collective knowledge and experience of the officers." *Id*. at 631-32 (citation omitted).

In closing argument, Roberts challenged Trooper Styles's questions beginning immediately after the stop as unrelated to the initial traffic violation. Roberts also contends that Trooper Styles lacked reasonable suspicion and unnecessarily prolonged the traffic stop with pretextual inquiries. The government responds that Trooper Styles had developed reasonable suspicion that Roberts was involved in criminal activity *other than* the traffic violation, and that he was justified in briefly extending the stop to ask Roberts for permission to search the vehicle.

First, the court disagrees that Trooper Styles's questions between when Roberts' vehicle was stopped and when the warning was issued are a basis for suppressing the evidence. Trooper Styles's acts and questions were all "reasonably related to the circumstances that justified the stop[.]" *Brigham*, 382 F.3d at 507. "Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to [the traffic] stop." *Rodriguez*, 135 S.Ct. at 1615 (alteration in original). These inquiries include inspecting a driver license, automobile registration, and insurance; running computer checks; and checking for outstanding warrants against the driver. *See Spears*, 636 Fed. Appx. at 901. "These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Rodriguez*, 135 S.Ct. at 1615.

An officer may also ask about the purpose and itinerary of the trip, and may even ask questions on a subject unrelated to the purpose of a routine traffic stop. *Brigham*, 382 F.3d

at 508. "[N]o Fourth Amendment harm is done where the officer asks the occupants of a vehicle questions that are unrelated to his reason for stopping the vehicle while waiting for routine computer checks to be processed." *Pack*, 612 F.3d at 350. In this case, Trooper Styles inspected the license and registration, ran computer checks, and spoke with Roberts and Luke about their itinerary for a total of about 15 minutes before issuing the warning. Trooper Styles was entitled to perform these acts because they were reasonably related to the initial traffic violation. It was not necessary for Trooper Styles to have developed reasonable suspicion of additional criminal activity to justify any of the time that elapsed before he issued the warning, although the record shows that he did.

Second, to the extent Roberts challenges the time between when Trooper Styles issued the warning and returned her documents and when Roberts consented to the search of the Jeep, the court disagrees that this time period is a basis for suppressing the evidence. If, during a lawful traffic stop, an officer develops reasonable suspicion of additional criminal activity, he may further detain the occupants of the vehicle for a reasonable time while attempting to dispel this reasonable suspicion. *Andres*, 703 F.3d at 833. In this case, the time that the government must justify is brief: within one minute of issuing the warning and returning Roberts' documents to her, Trooper Styles asked for, and Roberts gave, consent to search the Jeep.

The government proved by a preponderance of the evidence that Trooper Styles developed reasonable suspicion of additional criminal activity during the initial stop and before Roberts consented to Trooper Styles's request to search the Jeep. The facts of this

case are similar to those in *Pack*, 612 F.3d at 361-62, in which the Fifth Circuit held that reasonable suspicion sufficient to support a 35-minute investigatory stop was created by the defendant's extreme nervousness, conflicting stories, and the fact that he was traveling along a drug trafficking corridor. *Id.* In reaching its conclusion, the court gave "significant weight" to the detaining officer's suspicion, noting that "he had been a law enforcement officer for seventeen years." *Id.* at 361. As to the allegedly suspicious facts the detaining officer observed, the court held that the officer had developed reasonable suspicion:

> [w]hen the occupants of a vehicle are nervous and tell such irreconcilable stories to the police, the number of likely explanations for their conduct is limited. . . . Considering the large volume of contraband that is moved along our major highways on a daily basis, especially in border states like Texas, a reasonable officer could fairly conclude that the most likely single alternative explanation, for the nervousness and irreconcilable stories raising reasonable suspicion of some criminal activity, is that the occupants are carrying contraband . . . Therefore, we think that it is reasonable for an officer confronted with such conduct to detain the occupants for a reasonable amount of time to investigate the possibility that they are carrying contraband.

*Id.* at 362.

At the suppression hearing, Trooper Styles testified regarding his extensive experience in narcotics interdiction, including hundreds of traffic stops that have resulted in seizures of narcotics. During the stop in this case, Trooper Styles made a number of observations that led him to develop reasonable suspicion that additional criminal activity was afoot. As in *Pack*, Roberts was traveling along a drug trafficking corridor: in this case, I-40. When Trooper Styles first observed the interior of the Jeep, he noticed immediately what he

characterized as "a lot of hard traveling," i.e., several fast food and drink items. Trooper Styles testified that, based on his experience, hard traveling indicates that someone is trying to get from one place to another on a time crunch, and it is common for people smuggling narcotics. Trooper Styles also testified that it seemed that Luke was attempting to distance herself from Roberts by stating, "I just rode with her." Trooper Styles stated that he found it suspicious that Luke could not recall basic details about her own grandmother's funeral, including the venue name and date.

As in *Pack*, in response to Trooper Styles's questions, Roberts and Luke offered inconsistent stories about their trip itinerary. They provided conflicting information regarding where they had stayed on the trip (Luke said her aunt's house; Roberts said the Day's Inn), their relation to the person who died (Luke said it was her grandmother; Roberts said neither she nor Luke was related to the person who died, and provided the name "Keisha"), and where they had been (Roberts said the funeral was in the Las Vegas area; Luke did not mention anything about Las Vegas). Trooper Styles said he found it suspicious that Luke would travel on a cross-country road trip, considering her high-risk pregnancy. Roberts also exhibited several indicators of nervousness, including a rapidly beating carotid artery.

Accordingly, the court holds that, viewed in totality, these factors provided "reasonable suspicion of additional criminal activity." *Pack*, 612 F.3d at 350. Trooper Styles was therefore entitled to detain Roberts for a reasonable time beyond the point at which he returned her documents, while attempting to dispel this reasonable suspicion.

During that brief period, Trooper Styles obtained Roberts' consent to search the Jeep.

V

Roberts maintains that she did not validly consent to the search of the Jeep. She also contends that, even if her consent was valid, Trooper Styles exceeded the scope of her consent by inflicting damage to the underside of the Jeep and transporting it to the Panhandle DPS Office.[3] The government responds that Roberts' consent was voluntary. And it maintains that, regardless whether Roberts consented, Trooper Styles had probable cause to move the vehicle to the Panhandle DPS office and search the secret compartment once he discovered it beneath the Jeep.

A

The court first addresses whether Roberts' consent was voluntary.

1

"A search conducted pursuant to consent is excepted from the Fourth Amendment's . . . requirements." *United States v. Solis*, 299 F.3d 420, 436 (5th Cir. 2002). Where the government asserts that no search warrant was required because the officer obtained consent to search, the government must prove by a preponderance of the evidence that consent was freely and voluntarily given. *United States v. Tompkins*, 130 F.3d 117, 121 (5th Cir. 1997). Whether "consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the

_____

[3]Roberts maintains that the vehicle was damaged during both the roadside search and the more thorough search conducted at the Panhandle DPS office.

circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973).

> In evaluating the voluntariness of consent, [the Fifth Circuit] look[s] to six factors: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

*United States v. Cavitt*, 550 F.3d 430, 439 (5th Cir. 2008).[4]  No single factor is dispositive or controlling.  *Solis*, 299 F.3d at 436.

2

In this case, Roberts was not physically restrained at any time during the stop.  *See United States v. Garcia*, 68 F.3d 464, 4 (5th Cir. 1995) (per curiam) (finding voluntariness when "[a]lthough [defendant] was not completely free to walk away, he had not been subjected to that degree of restraint associated with formal arrest.").  As to the second factor, Trooper Styles did not engage in coercive tactics during the stop, and he was quite polite when questioning Roberts.  *See United States v. Hernandez*, 279 F.3d 302, 308 (5th Cir. 2002) (finding lack of coercion when police officer did not display his weapon and failed to threaten defendant in any way); *United States v. Ordonez*, 244 F.Supp.2d 770, 774 (S.D. Tex.

---

[4]In closing argument at the suppression hearing, Roberts' counsel relied on the two-pronged inquiry concerning whether consent to a search can cure a prior Fourth Amendment violation: "1) whether the consent was voluntarily given; and 2) whether the consent was an independent act of free will."  *United States v. Jones*, 234 F.3d 234, 242 (5th Cir. 2000) (citing *United States v. Chavez-Villarreal*, 3 F.3d 124, 127 (5th Cir. 1993)).  The court need not address this test given its conclusions that neither the initial traffic stop nor the questioning of Roberts violated the Fourth Amendment.

2003) (finding lack of coercion when police officers treated defendant politely).  As to the third factor, there is no evidence that Roberts failed to cooperate with Trooper Styles.  *See Hernandez*, 279 F.3d at 308 (finding defendant cooperated when no indication defendant displayed hostile actions toward police officer nor that she attempted to frustrate investigation).  As to the fourth factor, although there is no evidence that Roberts knew she had the right to refuse consent, this factor alone is not dispositive of voluntariness.  *See Solis*, 299 F.3d at 436.  Regarding the fifth factor, Roberts' communications with Trooper Styles, as captured on the video played at the suppression hearing, indicate that she is of at least average intelligence.  She informed Trooper Styles that she worked for the City of Orlando, Florida, and there is no evidence to suggest that her intelligence would impact the voluntariness of her consent.  As to the sixth factor, although the Jeep contained alleged drugs, Roberts may have believed they would not be found because they were concealed in a secret compartment.  *See United States v. Ramirez*, 213 F.Supp.2d 722, 728 (S.D. Tex. 2002) ("Although Defendant likely knew that there was marijuana in his truck, the manner in which it was stored inside the diesel tank may have caused him to believe that Trooper Ramirez would not discover it."), *aff'd*, 66 Fed. Appx. 523 (5th Cir. 2003).

Roberts maintains that she did not sign a consent form permitting search of the Jeep.  Verbal consent to search the Jeep, however, is sufficient.  *See United States v. Mata*, 517 F.3d 279, 291 (5th Cir. 2008) (even where defendant refused to sign written consent form, court considered verbal consent voluntary).  Accordingly, the court holds that the government proved by a preponderance of the evidence that Roberts freely and voluntarily

consented to the search of the Jeep.

B

The court next considers whether the search of the Jeep on I-40 exceeded the scope of Roberts' consent.

"The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). "The scope of a search is generally defined by its expressed object." *Id.* (citing *United States v. Ross*, 456 U.S. 798 (1982)). "When an officer does not express the object of the search, however, the searched party, who knows the contents of the vehicle, has the responsibility explicitly to limit the scope of the search." *Cotton*, 722 F.3d at 276 (internal quotation marks omitted). "[A] failure to object to the breadth of the search is properly considered an indication that the search was within the scope of the initial consent." *United States v. McSween*, 53 F.3d 684, 688 (5th Cir. 1995) (citation and internal quotation marks omitted).

In this case, Trooper Styles asked Roberts, "can I search the vehicle and make sure there is nothing?" Almost immediately after the question was posed, Roberts responded, "sure," without expressly limiting the scope of the search. And, knowing the contents of the Jeep, Roberts did not withdraw consent at any time. When Corporal Bridges and Trooper Styles examined the underside of the Jeep, Roberts neither withdrew consent nor explicitly limited the scope of the search. And she did not withdraw consent when they moved the

- 21 -

vehicle to the Panhandle DPS office.  The video shows that no part of the roadside search took place outside Roberts' view, and none of the testimony indicates otherwise.  *See United States v. Guerrero*, 806 F.Supp.2d 992, 1000 (S.D. Tex. 2011) (holding that fact that search occurred within defendant's full view without objection indicated search within scope).  The court thus concludes that it was objectively reasonable for the officers to interpret Roberts' general consent to search the vehicle as inclusive of the underside of the Jeep and the secret compartment.

Roberts maintains that her consent did not reasonably include "prying, tearing or peeling back (like a can opener), the metal undercarriage area in the rear left area of the SUV." D. Br. 13.[5]  "Although an individual consenting to a vehicle search should expect that search to be thorough, he need not anticipate that the search will involve the destruction of his vehicle, its parts or contents."  *United States v. Ibarra*, 965 F.2d 1354, 1358 (5th Cir. 1992) (per curiam) (citing *United States v. Strickland*, 902 F.2d 937, 941-42 (11th Cir. 1990)).

Trooper Styles credibly testified that, while conducting the search on the roadside of I-40, he merely used an upholstery tool to scrape some over-spray off the frame of the

_____

[5]Roberts relies on *Cardenas v. State*, 857 S.W.2d 707 (Tex. App. 1993, pet. ref'd), for the proposition that consent to search a vehicle does not reasonably include towing the car or breaking into a concealed tire well.  This court is not bound by the rulings of state courts. Even so, the *Cardenas* court focused on the wording of the officer's request to "look in" the vehicle, holding that consent to such a request would not "include authorization for the police to tow his car to a police garage or break into the concealed tire well."  *See id.* at 710.  This limitation on consent distinguishes *Cardenas* from the present case, in which neither the troopers nor Roberts expressly or implicitly limited the scope of the search.

vehicle and did not inflict damage on the vehicle. He testified that the hole through which

he observed the electrical tape was created by rust, not by any search methods used by the

officers. Scraping and banging the frame of the vehicle do not rise to the level of property

damage that falls outside the scope of general consent. *Cf. Ibarra*, 965 F.2d at 1358 (holding

that using sledge hammer to knock out boards blocking attic entrance was outside scope of

consent); *Strickland*, 902 F.2d at 941-42 (holding that consent did not reasonably include

consent have spare tire slashed).

The court thus holds that Roberts gave general consent to search her Jeep, and that at

no point did the search on the roadside of I-40 exceed the scope of the consent that Roberts

gave before the search commenced.

## C

Finally, the court turns to the question whether the troopers could legally search the

Jeep's hidden compartment. The government maintains that Trooper Styles had probable

cause to conduct this search.

## 1

"An exception to the Fourth Amendment's warrant requirement exists when a police

officer has probable cause to search an automobile for contraband." *United States v. Powell*,

732 F.3d 361, 372 (5th Cir. 2013) (citing *Almeida-Sanchez v. United States*, 413 U.S. 266,

269 (1973)). "Probable cause exists when facts and circumstances within the knowledge of

the arresting officer would be sufficient to cause an officer of reasonable caution to believe

that an offense has been or is being committed." *United States v. Carrillo-Morales*, 27 F.3d

1054, 1062 (5th Cir. 1994) (citing *United States v. De Los Santos*, 810 F.2d 1326, 1336 (5th Cir. 1987). To determine whether probable cause existed, "courts examine the totality of the circumstances." *Powell*, 732 F.3d at 372 (citing *Illinois v. Gates*, 462 U.S. 213, 234 (1983)). "Probable cause exists if, under the totality of circumstances, there is a fair probability that. . . an illegal act is taking place." *United States v. Thompson*, 2012 WL 1161609, at *3 (N.D. Tex. Apr. 9, 2012) (Fitzwater, C.J.) (citing *United States v. Newman*, 472 F.3d 233, 236-37 (5th Cir. 2006)).

2

The court has already determined that Roberts gave general consent to a search of the Jeep. As Trooper Styles and Corporal Bridges searched the Jeep on the roadside of I-40, they observed rust under the vehicle and a hole in the undercarriage. Through the hole, they could see what appeared to be electrical tape, which they believed could be a bundle of narcotics. They also could see a crack on the frame with Bondo filler around it. These observations collectively led Trooper Styles and Corporal Bridges to believe that the Jeep contained a secret compartment. The existence of "a hidden compartment supports 'probable cause' for a search / arrest." *United States v. Estrada*, 459 F.3d 627, 633 (5th Cir. 2006) (citing *United States v. Price*, 869 F.2d 801, 804 (5th Cir. 1989)) ("Once the agents had discovered the secret compartment they had probable cause to search the compartment itself.") (other citations omitted); *United States v. Banuelos-Romero*, 597 F.3d 763, 768 (5th Cir. 2010). The court is not persuaded by Roberts' argument that the troopers could not legally pry, tear, or peel back the metal undercarriage area in the rear left area of the Jeep. By the time the

troopers conducted a more thorough search, they had developed probable cause based on their observations of the hidden compartment. At that point, they had a legal basis to relocate the Jeep to the Panhandle DPS office and take the necessary measures to access the hidden compartment. *See Price*, 869 F.2d at 804 (holding that agents with probable cause could remove foam backing behind carpet and metal plate taped to wall of cab to search secret compartment).[6]

\* \* \*

In sum, Trooper Styles had reasonable suspicion to effect the stop of Roberts' vehicle based on a violation of Tex. Transp. Code Ann. § 545.062(a). Once he effected the stop, he inspected the Jeep's license and registration, ran computer checks, and spoke with Roberts and Luke about their itinerary, which were all acts reasonably related to the initial traffic stop. During this questioning, he developed reasonable suspicion that additional criminal activity was afoot, which justified prolonging the *Terry* stop beyond the point at which he issued the warning and returned Roberts' license and registration to her. Trooper Styles then almost immediately asked for and obtained Roberts' general consent to search the entire Jeep. During this search, a hidden compartment was discovered. At the point that Trooper Styles and Corporal Bridges observed signs of a secret compartment, they developed

---

[6]The troopers also had an alternative basis for searching the secret compartment at the Panhandle DPS office. At no point did Roberts withdraw her consent to the search. She was informed that the troopers would be moving the Jeep, but she did not object. There is no evidence that Roberts limited the scope of the search at any point during her interaction with the troopers.

probable cause to transport the Jeep to the Panhandle DPS office and access the secret compartment itself.

Accordingly, the court holds that Roberts' Fourth Amendment rights were not violated, and it denies her motion to suppress.

**SO ORDERED**.

April 11, 2018.

_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE